The next matter, number 24-1832, J.S.H. v. Alice Newton, et al. At this time, would Counsel for the Appellant please introduce himself on the record to begin? Good morning, Your Honors. Luke Rose Seal for the Appellant, J.S.H. individually and as personal representative of the estate of G.H. And may it please the Court, may I please reserve three minutes for rebuttal, Your Honor? You may. Thank you. On this record, a jury could reasonably find that Dr. Newton used her medical position at MGH as a pretext for an intentional, discriminatory campaign of lies that denied G.H. meaningful access to care and caused severe emotional distress. And I'm going to start with the 504 issues first, if it please the Court, and I'm prepared to go through the September 9th letter and articulate the lies that are in that letter and in the 51A report because there is a dispute among the parties whether those lies are proven as a factual matter or could be proven as a factual matter on the record. But I think the time would be better served by getting right through to the legal issue, which is the denial of meaningful access to care under 504. Now what the controlling regulation says, 34 CFR section 104.4b-7. Counsel? Yes. Before you read us the regulation, which I think probably all of us have looked at, I just wanted to ask you just more of a factual question, which is where in the record is there evidence that there was some sort of denial or lack of meaningful access to care to GH because of the letter or the notes by Ms. Newton? Is it anything other than the father's deposition testimony? I'd say two things on that, Judge Ruckelman. Under the standard, we would say that the placing of the letter in the medical record itself denied meaningful access to care. Now this is different than the mine run of cases where it's a discriminatory doctor who's refusing to treat a patient. This is, of course, discrimination by a doctor with whom the patient wants nothing to do causing denials of care elsewhere. And so aside from what we rely on for the factual material, there is the father's deposition testimony that in the course of participating and witnessing the care that his child was receiving, Dr. Tiber at UMass saw the 12-page letter and refused care. Dr. Hirsch at UMass saw the 12-page letter and refused care. And then the third point is Dr. Young, who is at MGH, and any provider at MGH, that there was a constructive lack of meaningful access to care resulting from the letter because the letter gave the parents good reason to avoid receiving treatment from MGH providers. So just to make sure, I'm sorry, I understand your argument that the two pieces of record evidence you would point to would be the testimony of the father and just the fact that the letter was placed into his medical record. Is that right? Is there anything else? I just want to make sure I understand for your Section 504 claim. I guess the other that we would point to, to some extent, on the Section 504 complaint would also be the lies in the report to DCF because those filter their way back into the medical care milieu and place a lack of meaningful access for that reason as well. And I think the fundamental underlying legal dispute among the parties is a narrow interpretation of 504 that says, listen, this is only here when there's a discriminatory doctor from whom the patient wants care and the doctor will not provide the care. Let's just assume that we agree with you for the moment about what the legal standard is. Again, I'm just trying to get you to focus in on causation, meaning what in the record shows that there actually was some loss of care. And so what you're saying is the father's testimony is really what you're relying on? That's correct, Judge Rippleman. Okay. Thank you. And so that is the legal issue with respect to 504. Now, of course, the lack of meaningful access to care must bear a causal nexus to the discriminatory conduct and here the father's testimony tends to indicate that it does. There's an argument by MGH and there's an argument by Dr. Newton that there are forms of immunity that should apply in this case because what was going on here was the provision of medical services, the provision of medical care, and carrying on the charitable mission of MGH. And there's ample evidence in the record from which the jury could reasonably find that, in fact, this was not the provision of medical services, that medicine was being used as a pretext to affect this discriminatory animus. As I said, I prepared to go through at least four lies in the letter, three lies in the 51A report, but I think those are spelled out adequately in the brief. And so that is the main argument on the Section 504 claim, is that the lies in the letter and the 51A report show that there was Section 504 discrimination going on and that there was a denial of meaningful access to care based on the placing of the letter into the file as well as the father's testimony. So as I understand it, for at least some of your claims, you had to have evidence of more than ordinary garden-variety emotional distress. Correct. That's the individual claims against the Dr. Alice Newton. That's correct. And as I understand it, during the discovery period, the other side asked your client in interrogatory, tell us about your emotional distress, and your client said, if I have anything more than garden-variety emotional distress, I'll supplement these answers. Yes. And may I drill down on the timeline there, Judge Kayada, because I do think it's important how this went time-wise. So we go back to December 2023. At that time, the district judge puts in place a discovery order setting deadlines and puts the trial on for August of 2024. That's in December 2023. The parties go back before the district judge in March and ask for the discovery deadlines to be extended and ask for the trial to be postponed. The district judge extends the discovery deadlines, and this is, I think, Record Appendix pages 4 to 5, but does not put additional discovery deadlines into place, does not put a new scheduling order in place. Says, I'm leaving discovery open, but I'm not going to move the trial. The trial's staying on for August. And that happens in March 2024. Then we go forward to May 2024. There's a plan for the defendants to take JSH's deposition. That gets taken off the first week of May by agreement of the parties. And the following week, one of the two parties, GH, succumbs to their illness. And so what the defendants say in their briefs is there needed to be some reasonable grieving time there. We couldn't just insist on trying to depose the grieving mother right there and then. So instead, what the defendants elected to do, while discovery was still open, no discovery deadlines had lapsed, was to just move for summary judgment within about three weeks of one of the parties having passed away. It was under those circumstances that JSH then supplemented her prior discovery responses that had presaged such supplementation with an affidavit that is more than adequate under both the NIED standard articulated under Massachusetts law and the intentional infliction of emotional distress standard under Massachusetts law. Counsel, if I can ask you to focus in on the substance of the affidavit, I understand your arguments that there was no issue with its timeliness for the reasons that you just laid out. So again, let's just assume we agree with you that it was perfectly appropriate to submit a declaration at that point in opposition to summary judgment. In terms of the substance of what your client said in the declaration, why is it enough under the governing law? Because it seems that in most of the cases that I've been able to find, and maybe you can point me to a different case, there generally is medical testimony of some kind, whether from a nurse or a doctor, that backs up the individual's self-reports of symptoms. So there wasn't that here. Is there a case you can point us to that supports your argument that this brief declaration, I think it was less than two pages, was enough? Yes. And so first I'll go through the substance of the declaration, then I'll try to cite the six cases that I believe answer your question, Judge Rickleman. Substance of the affidavit attests to anxiety, PTSD, headaches, fatigue, nightmares, sleeplessness, panic attacks on a weekly basis for which she ultimately sought counseling. Now the cases. Kelly v. Brigham and Women, 51 Mass. App. Court, 297-2001. Plaintiff's own testimony regarding, quote, cramps, shortness of breath, and nightmares sufficed under NIED, no expert support. Breshawn v. McCullough, 47 Mass. App. Court, 278. Stomach pain, nausea, body shakes, and reduced libido sufficed, no expert support. Dyer v. Steward Kearney Hospital, 2021 Westlaw, 4554083, District of Massachusetts case, difficulty eating, sleep disturbances, and suicidal ideations, no need for expert support. Ferragamo v. Chubb Life, 894 F. Sup. 33, another District of Massachusetts case. Ferragamo's sworn statement is sufficient to meet the requirements of Sullivan, no expert support. Those are NIED cases. IIED cases. First Circuit case from 2018, Cindy v. El Moslemany, 896 F. 1st, 23rd, Massachusetts law allows recovery in emotional distress case based exclusively on lay testimony. Another one, two more actually, Poi v. Botcellos, 352 F. 3rd, 479. And finally, a very recent SJC case on IIED, Lanier v. President and Fellows of Harvard College, 490 Mass., 37. The fact that this distress has, as alleged, been manifested in symptoms such as nausea and insomnia is enough to plausibly suggest that Lanier has suffered severe distress. In other words, the physical manifestations that must be shown for NIED if they're proved suffice also to prove the level of severity needed for intentional infliction of emotional distress. Which of the symptoms reported in the declaration would you say supports the severe emotional distress that's needed for an IIED claim? Certainly. Anxiety, PTSD, headaches, fatigue, nightmares, sleeplessness, weekly panic attacks that lead the person to receive treatment. And I make one other point there, if I may, Judge Rickleman, which is right from the Sullivan case itself. The nature of the incident that caused the plaintiff's alleged mental distress can corroborate the genuineness of their claims. Any parent can imagine the severity of emotional distress at the threat of the child being removed from the parent. When the child is terminally ill and the party trying to remove the child from the parent is an authority figure, with the ability to wield great power on behalf of a generation's old institution, of course it's going to be severe emotional distress. That goes right into Sullivan that the nature of the incident helps to prove the severity as well. Say we disagree with you and we think the district court was right in not abusing its discretion and refusing to consider the affidavit. Is there anything you would cite to in the record that would still establish the NIED claim? No. What I would say is two things on that. It doesn't impact the 504 claim necessarily, Your Honor. And with the order of events, we haven't asked for this in the brief and I recognize that this court does have the power to do this kind of thing, where the defendants elect to move for summary judgment when there had been a plan in place to take a deposition that would have addressed this, they do that within three weeks of one of the parties passing away is at the very least a remand, where discovery was still open as well, a remand would be appropriate in the circumstances. Unless there are other questions, I'll reserve my remaining time for rebuttal. Good morning. May it please the Court. I represent Christine Coolidge on behalf of the appellee, Dr. Alice Newton. The district court properly granted summary judgment as to Dr. Newton because the plaintiff failed to present sufficient evidence of emotional distress and objective evidence of physical manifestations resulting therefrom. So if I may first address the negligent inflection of emotional distress claim, which is as to G.H., the mother, only as the plaintiff concedes in her appellant's brief that there is insufficient evidence to support the NIED claim as to G.H., the child. So with respect to the emotional distress required under NIED, the plaintiff has pled simply garden variety, which is not sufficient to sustain the claim of NIED. In fact, the plaintiff's answers to interrogatories state as much, and they were not supplemented with ample opportunity to do so. So what do you say about, as I understand this is a rather technical argument made, that the discovery period was in effect dissolved and there was, the end of it was dissolved and there was no end to the discovery, so therefore the affidavit was within the discovery period. Well, first, you only heard about one deposition notice. The plaintiff's deposition was actually noticed on five occasions, two of which had to be taken off because court conferences for this very case was scheduled at the same time. It was taken off another time because the plaintiff produced thousands of pages of records on the eve of the deposition and then placed some unnecessary burdens on the deposition, meaning various time limitations and the like. And then the last time was taken off, mutually agreed upon because of the passing of G.H. and the fact that J.S.H. was not able to appear for her deposition at that time frame. The summary judgment motion was filed in accordance with the court rules and the deadline set by the court. There were no options to delay. Was there a deadline for completing discovery? The court in March, when we had gone back to the court in March and asked for, mutually asked for extensions of both the trial date and the discovery deadline, the court did not grant the request to move the trial date, but essentially allowed the parties to agree upon discovery as we saw fit. So I don't, I also want to point your Honor's attention to the- No, but I'm not sure I got an answer to my question. Was there an end to the discovery deadline? Was there a deadline? There was a specific date that the parties had agreed that all discovery, not that I'm aware of, Your Honor. So why was the supplementation untimely? Because it was filed in connection with an opposition for motion for summary judgment when they had ample time throughout the entire course of discovery to provide the supplementation to their answers to interrogatories. The defendants were not required to ever take the plaintiff's deposition in the case. There's ample opportunity to present their evidence in many other ways. In addition to answers to interrogatories, there's also medical records and mental health records that were also requested that were never produced. So the fact that the plaintiff is relying on the lack of a deposition only, also we did take the deposition of J.S.H.'s husband, and again, there is another opportunity for the plaintiff to step forth. But, Counsel, I think that what we're trying to understand is if discovery was open and you made the decision, which is a perfectly valid decision to go ahead and move for summary judgment when your client decided it was an appropriate time, why was it inappropriate then to submit a declaration in opposition to the summary judgment motion? In other words, discovery remained open. Maybe there would have been supplementation, but in any event, a declaration was submitted. It isn't really the issue whether the declaration was somehow inconsistent with what was said before. You know, there's a timeliness issue, and then there's an inconsistency issue. So I'm wondering if we can just put the timeliness issue to the side for a moment. Why do you think the declaration or affidavit was inconsistent with what had been said during the discovery, during the previous discovery responses? Yes, Your Honor, because the previous discovery responses, particularly in the answers to interrogatories, explicitly state that if they are going to claim anything more than garden variety, they would supplement, but also there is a lack of any other discovery that was produced. We specifically asked for mental health records, specifically. And in the affidavit, the JSH states that apparently she was, in fact, treating with a therapist in connection with her alleged damages, yet those records were never produced during discovery. Did you request the records after the declaration was provided? Yes. Oh, after the motion for summary judgment? Yes, after it was filed in opposition to the summary judgment. No, Your Honor. Those records were requested long before. They were requested in connection with the case and never produced, and in connection with discovery. Well, I guess, I think what I'm still trying to understand is why would it be inappropriate, though, to just consider the declaration or affidavit for what it is? In other words, there are no medical records attached to it. There's a reference to being treated by a social worker, I believe it was, but in any event, really, what precluded the district court from considering what was in the declaration? You can say it's not enough legally, and I would like to hear your argument on that point, but at that, you know, at that point during the litigation process, discovery had been extended. You choose to move for summary judgment. People file declarations in opposition to motions for summary judgment all the time. So what is your best argument for why this affidavit shouldn't have been considered at all? Well, for one thing, the case law is clear that when an affidavit is filed in connection with an opposition to a motion for summary judgment, that that is at the 11th hour trying to create a triable issue of fact where there was no evidence to support those contentions. And in fact, those contentions... That's the inconsistent point. So could you just focus in on why do you think what was in the declaration was inconsistent with what had been said before? There had not been anything said before that, apart from what was in the original complaint, Your Honor. The only... There was no evidence. There's no inconsistent to be had other than the fact that in the answers to interrogatories, there was a statement about the garden variety. I can also point to the husband's testimony, which when that question was asked, he spoke only about a 2013 incident at Tufts Medical Center, completely unrelated to the events in this case. And that was the only evidence or answer to any emotional distress that JSH had had. And so... Counsel, if we just assume for a moment, just because we have limited time, that we do consider the declaration for whatever appropriate evidentiary weight it has, can you move to arguing why you think it's not enough to support the NIED or IED claims? Certainly, Your Honor, because there is no corroboration of any of the statements within the affidavit. And while we heard, I think, six cases where there was no expert support and that was sufficient, I submit that the case law actually states that there must be some corroboration. It doesn't have to be by expert testimony, but there should be some corroboration, whether it's in the form of medical records, it can be testimony of family, friends, other lay witnesses that had made observations, and it can be in other forms, such as the affidavits of treating doctors. So in this case, we have none of those to support. And the case law is also very clear that there must be some objective evidence corroborating the statements that are made by the plaintiff with respect to their symptoms, their physical symptoms of emotional distress. So for those reasons, I would submit that there is not sufficient evidence to support the claim for negligent infliction of emotional stress, as well as intentional infliction. The court did not reach the issue of negligence, the district court did not, but I would also submit that there is not sufficient evidence to support that Dr. Newton owed a duty to JSH. Her duty was to the patient, in this case, the child, GH. And even assuming the court were to find that some duty were owed to the parent of a patient, it would be that of a reasonably prudent person in the circumstances where this is not a medical malpractice case per se, and the reasonably prudent person in the circumstances would only be a child protection team member or a child abuse pediatrician. Isn't it, isn't it, I mean, we have to put this in context, if the plaintiff is correct in her allegations, then what we have is a mother whose small child is dying, being accused of killing the child when she had nothing to do with it other than caring for the child. That would be a pretty devastating acquisition that would cause most people quite serious emotional distress, wouldn't it? That's the context we have here. Yes, Your Honor, with respect to, I would put this in context, first, those are only allegations that were not supported by any evidence in the record, but also with respect to the intentional... Wait, you're saying that there's no evidence in the record that her child was dying or that she was accused of killing the child? No, the record supports that Dr. Newton raised a question of medical child abuse, essentially over-medicalization of the child, and that is the evidence in the record and what's supported in the note. So you're saying she was never accused of killing her child? I don't think that it was ever stated as killing her child, Your Honor. Well, you know what I mean. I think it's, as a child abuse pediatrician, her job is to rate, to observe and raise concern. Sure, now you're arguing the merits of whether what she did is wrong, but in terms of the emotional distress issue, in our quest to find corroboration, shouldn't we take into consideration the circumstances that gave rise to the emotional distress, with the potential that the fact finder could say that given those circumstances, any reasonable person would be very severely distressed to watch their child died as a medical provider is standing there accusing the mother of killing the child? Yes, Your Honor. I think that that could be said of every single parent that Dr. Newton encounters for every patient she's involved with, because of the nature of her job. But to sustain that IAED claim, you have to look at Dr. Newton's conduct and whether it was so outrageous in character that it would be utterly intolerable in a civilized society and her actions here are in connection with her. Sure. Now you're on the merits, and I understand your argument on the merits. While you're on the merits, if I could, on the 504 claim, it seems that the district court interpreted Leslie as saying the 504 claim is limited to outright denials of service, and therefore there's no evidence here for denial of service, and then the parties are debating that. But didn't we make clear in subsequent decisions that 504 is not strictly limited to denial of service claims? Your Honor, I would defer to my sister counsel, as there's no 504 claim against Dr. Newton, and so I believe my sister counsel will address the 504.  Counsel, I have just one other question for your client. Can you tell me whether the record tells us how many 51A complaints Dr. Newton made against JSH? I just wasn't entirely clear from reading the briefs. I tried to figure it out, but I wasn't entirely sure. I know there's at least two. Were there more than two? This record is silent, Your Honor, as to that issue. There's allegations there were more, and the allegations are with respect to claims that were filed at Tufts Medical Center that Dr. Newton never worked at, was not employed by, had no involvement in, but the record is actually silent as to that fact. There's just these allegations that she was involved in more, but the evidence shows otherwise. So the record shows two, one when she first encountered the family, and then the other one in 2018. Is that correct?  2011 and 2018. Okay. Thank you. Thank you. Thank you, counsel. At this time, would counsel for the Mass General Hospital please introduce herself on the record to begin? Good morning, Your Honors, and may it please the Court, Emily Mollers on behalf of Defendant Appali, Massachusetts General Hospital. This Court should affirm the District's Court's entry of summary judgment on behalf of Massachusetts General Hospital as it appropriately found that there was no evidence to support a prima facie case of Section 504 disability discrimination against GH. There is no evidence in the record that is admissible at trial to support the contention that GH was ever denied or somehow prevented from seeking medical care or treatment at MGH or from any of the MGH providers. I understand to Judge Kayada's question to counsel a moment ago that there is an assertion by the plaintiff that the District Court too narrowly interpreted the Section 504 to mean only a denial of services, strictly a denial of services. I think that Leslie is fairly clear that that is the appropriate interpretation. Does Buchanan cast some doubt on that? Excuse me, Your Honor? What about our decision in Buchanan? I think even accepting that a more broad interpretation of what constitutes a denial of medical care and treatment under Section 504, even if we were to assume that without conceding it, there still is not record evidence that GH was denied services or somehow treated differently or somehow prevented from seeking care that he would have elected to receive otherwise. In fact, in response to Judge Ruckelman's question, the plaintiff conceded that the only evidence truly in the record that they are relying upon rests in the father's testimony. I believe Appellant's counsel mentioned a Dr. Hirsch, a Dr. Tiber, and a Dr. Young. A closer examination of the record with respect to the father's testimony as to those three providers in particular does not lend itself to competent admissible evidence. Upon further review of that, his information was conclusory and speculative. They were based on conversations he did not have himself, was not privy to, and were generalized statements that there had been some impact or that somebody, someone, a medical provider had declined to care for the patient. In contrast, if you refer to the treating physicians, Dr. Kimball-Wren's testimony and Dr. Stein's testimony, they explicitly said that his care did not change, that he was provided care and was continued to be followed by the specialists as well as his pediatrician as issues arose, suggesting that the prima facie case of a denial of services by any provider, such that it's a broader interpretation, this court elects to broaden their scope, is not proven. And on those grounds, the plaintiff had failed to meet their burden of proof to establish a prima facie case, and the district court's judgment in that respect should be affirmed. I would point out that the district court's decision, understanding that it is a de novo review here, thoroughly analyzed all of the record evidence available to it, including the father's testimony, including the letter itself, including the material, and determined that it did not rise to the level of evidence of any sort of denial of treatment with any respect. It was specifically focused on the denial of treatment by MGH, but did acknowledge these other providers, Dr. Hirsh, Dr. Tiber, as well as other UMass providers, and appropriately found that there was not evidence that GH had ever been treated differently or denied treatment, and particularly not solely on the basis of his disability, which the district court did not even reach because of the lack of evidence of a denial of treatment. In that respect, there is no evidence that he was denied any treatment alone, let alone by reason solely of his disability, and unless the court has further questions for me, rests on our briefs and requests that the judgment be affirmed. Thank you. Thank you, counsel. At this time, would counsel for the appellant please reintroduce himself on the record? He has a three-minute rebuttal. Good morning, Your Honors. Luke Rosile again for the appellant, J.S.H., and please the court. I want to start by pushing back respectfully but forcefully against my sister's assertion that the district court reviewed the record thoughtfully in this case in reaching its decision. There are large holes in the district court's decision that counsel strongly against that assertion. One that I would point out has to do with the notion of a peer review having taken place with respect to Dr. Newton. The district court describes it as undisputed that a peer review took place. In fact, the evidence is that no peer review took place. We hotly dispute that there was any peer review. The evidence on that was when the 30B6 opponent was asked whether there was any peer review or other investigation, it was difficult to get to the bottom of this in the deposition but ultimately his testimony was not to my knowledge. That's at 396 and pages 42, line 23 to 44, line 3. Dr. Newton herself. Counsel can I ask you to just focus on the NIED claim that you have against Dr. Newton? Can you help us understand what exactly is the duty that you think Dr. Newton owed your client and how she breached it? Because as you know, your opposing counsel argues that really the only duty would have been a medical duty and therefore you needed to introduce some expert medical testimony showing that she breached the duty. So can you weigh in and help us understand what exactly is the duty that you're alleging was owed? Certainly. So a duty arises in the NIED context when the would-be defendant commits conduct giving rise to the foreseeable risk of significant emotional distress. When I undertake to do some act, it's on me to be able to evaluate what are the foreseeable risks that I'm creating that I'm going to create severe emotional distress in others and it's for me to take reasonable care in either pursuing that course of conduct or deciding you know what, I'm not going to create that risk at all. And so here the course of conduct that created the risk giving rise to the duty was after Dr. Newton saw that or had reason to know that JSH had been disclosed as a witness in a separate case against her, going into the medical record, reaching out to the providers and enacting this campaign of lies designed to separate the child from the parent. That is a course of conduct giving rise to a foreseeable risk of causing severe emotional distress in the parent. It's not akin to medical. I'm asking you not so much to focus on the conduct because that would be relevant to whether the duty was breached but what is the duty itself? What created a duty that flowed from Dr. Newton to JSH? Certainly. When someone in Dr. Newton's position, and I may just go briefly over here if I may Judge Rickleman to answer your question as well as I can. When someone in Dr. Newton's position undertakes to use their medical authority, and this is findings the jury could make on this record, to prosecute a campaign of lies designed to separate a child from their parents, that decision gives rise to a duty to take reasonable care that the extreme emotional distress that can result from when allegations are made that a parent is killing their child, that reasonable care be taken there. And so in any NIDD case, the question is always whether, on the duty, is whether the conduct pointed to created a foreseeable risk of severe emotional distress. When it does, there's a duty, and when the jury can find as much, there's a duty to take reasonable care to avoid that severe emotional distress, and here that duty was breached. If Dr. Newton reasonably thought that the child was being put at risk by the mothers in doing so intentionally, didn't the doctor have a duty to do something about it? I think we lose at trial. If the jury decides that Dr. Newton reasonably thought what she was doing was furthering the mission of MGH's charitable mission, then we lose. And we could get directed out on that issue. To decide whether her judgment that there was a problem was reasonable or not, and this takes me back to Judge Rickleman's question, wouldn't the jury need expert testimony as to what a reasonable doctor would or would not conclude based on the information known to Dr. Newton? Perhaps they might absent the lies. The lies show no jury needs help to determine that when a doctor is lying in an effort to separate a dying child from their parent, the doctor is creating a foreseeable risk of extreme, severe if not extreme emotional harm in the parents, and that as a result the doctor has a duty to take reasonable care in those circumstances. And no expert testimony is needed to reasonably support the conclusion that by lying in an effort to separate the dying child from the parent, they're going to cause severe emotional distress absent reasonable care. Unless there's any other questions? I have a quick question on the affidavit. Assuming we agree that we think the district court should have considered that affidavit, is there any corroboration in the record of the mother's statements there that she was being treated for certain medical issues? I can say three things on that very quickly, Judge Montecalvo. Corroboration in the record. At 366, we have that same therapist, Hager, H-A-G-E-R, stating, I've been working with the family for years and have not so much as suspected or been concerned about my child's by proxy. It doesn't say I've just been providing therapy to G.H., I've been working with the family. And so that tends to corroborate that there was work there. Second point is on the six cases I listed earlier. Those cases discuss how the corroboration requirements were met there without additional medical records, additional testimony aside from the plaintiffs. And third is the point in Sullivan that, quote, the nature of the incident that caused the plaintiffs' alleged mental distress corroborates the genuineness of their claims. The nature of the incident here was such as to very foreseeably cause extreme emotional distress and so that also provides corroboration. Unless there's any other questions, I'll rest on my briefs. Thank you, Your Honor. Thank you, Counsel. That concludes argument in this case.